Matthew M. Clarke, State Bar No. 184959
Dugan P. Kelley, State Bar No. 207347
Matthew N. Mong, State Bar No. 273337
CHRISTMAN, KELLEY & CLARKE, PC
1334 Anacapa Street
Santa Barbara, CA 93101
Telephone: (805) 884-9922
Facsimile: (866) 611-9852

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Todd Mueller, an individual; and Todd Mueller Autographs, LLC a Colorado Limited Liability Company,

Plaintiffs,

vs.

Collectors Universe, Inc., a Delaware Corporation, doing business as PSA/DNA; James Spence Authentication LLC, a New Jersey Limited Liability Company; R&R Auction Company, LLC; Roger Epperson doing business as Signed Sealed and Delivered and Roger Epperson Authentication, Ltd; Steve Cyrkin, individually and doing business as live.autographmagazine.com; and Momentica, LLC, a California Limited Liability Company,

Defendants.

Case No.: 8:15-CV-01116-JLS-DFM

**FIRST AMENDED COMPLAINT FOR:**

1. **VIOLATION OF 15 U.S.C. §1**
2. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
3. **VIOLATION OF CALIFORNIA BUS. & PROF. CODE §17200**

**DEMAND FOR JURY TRIAL**

Plaintiffs Todd Mueller and Todd Mueller Autographs, LLC, (collectively referred to as "Plaintiffs" or "Mueller") hereby complains against Defendants Collectors Universe, Inc., doing business as PSA/DNA, James Spence Authentication LLC, R&R Auction Company, LLC, Roger Epperson doing business as Signed Sealed Delivered and Roger Epperson Authentication, Ltd., Steve Cyrkin, and Momentica, LLC, (collectively referred to as "Defendants"), and alleges as follows:

1. All allegations in this Complaint are based upon information and belief with the exception of those allegations, which are based upon personal knowledge. Plaintiffs' information and belief is based upon Plaintiffs' own investigation and the informal discovery and investigation conducted by Plaintiffs' counsel to date. Each allegation in this Complaint either has evidentiary support, or alternatively, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## I. <u>INTRODUCTION</u>

2. Mueller started in the autograph industry in 1978 as a collector and became a full time dealer of autographed memorabilia in the early 1990s. For over two decades, Mueller successfully engaged in his trade without interference or a negative comment anywhere. That all stopped when Defendants began to engage in the illegal, anti-competitive behavior directed at Mueller and his company.

3. In the autographed entertainment memorabilia industry, the authenticity of an item is the value of an item. Like other collectable industries, authenticity is determined by a few authenticators who specialize in the particular subject matter. Dealers and consumers alike are forced to rely on these authenticators to determine which items are genuine, and which items are not. Items that cannot be authenticated are worthless. This gives authenticators the power to determine the supply, and therefore the value, of items available to dealers and consumers within the market. Defendants have joined together as a complex association of dealers, auction houses, authenticators, and public personalities to deny the authenticity of genuine items that

competing dealers are attempting to sell to their customers. Defendants have violated Section 1 of the Sherman Act by agreeing among themselves to eliminate competition from the market, such as Mueller, by failing to authenticate items based on the competitor, not the items authenticity, and significantly reduced the number of dealers and authentic items within the market available to consumers. Such activity is per se illegal according to federal anti-trust laws, and Mueller now comes to hold Defendants responsible and break up Defendant's cartel.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over this action according to 15 U.S.C §15 and 28 U.S.C. § 1331.

5. Venue is appropriate in this district under 15 U.S.C. §22 and 28 U.S.C. §1391(b) because Defendants Collectors Universe, Inc., doing business as PSA/DNA, Steve Cyrkin, and Momentica, LLC, all transact business in this district and a substantial part of the events that give rise to this claim happened in this district.

## III. PARTIES

6. Plaintiff Todd Mueller is an individual residing in the State of Colorado, and is a leading dealer in autographed memorabilia throughout the world. Mueller operates as a dealer on an individual basis and through his company, Todd Mueller Autographs, LLC, a Colorado limited liability company.

7. Defendant Collectors Universe, Inc., is a Delaware Corporation, doing business as and through its division known as PSA/DNA ("PSA/DNA"). PSA/DNA is an autograph authentication company and is the self-proclaimed "leading third-party authentication service for autographs and memorabilia." ABOUT PSA AND PSA/DNA, http://www.psacard.com/About/PSA/ (last visited April 16, 2015). PSA/DNA's principal office is located in Orange County, California. It may be served with process by serving its registered agent Michele R. Taylor at its registered address at 1921 E. Alton Ave., Santa Ana, California 92705.

8. Defendant James Spence Authentication LLC, is a New Jersey Limited Liability Company ("JSA"). JSA is an autograph authentication company and is the self-proclaimed "foremost autograph authentication service in the world." AUTOGRAPH AUTHENTICATION FOR SPORTS MEMORABILIA, http://www.spenceloa.com (last visited April 16, 2015). JSA operates out of two principal offices located in the States of New Jersey and Florida. It may be served with process by serving its registered agent in New Jersey, Roy I. Weitzer, at its registered address in New Jersey at 143 Washington Street, Morristown, New Jersey 07960, or its registered agent in Florida, James Spence, III, at its registered office in Florida at 3223 N.W. 10th Terrace, Suite 104, Fort Lauderdale, Florida 33309.

9. Defendant R&R Auction Company, LLC, is a New Hampshire Limited Liability Company ("R&R"). R&R is an online autograph auction company that sells and authenticates autographed memorabilia to the public throughout the world, including the State of California. R&R may be served with process by serving its registered agent in New Hampshire, Gallagher, Callahan & Gartrell, P.C., at its registered office in New Hampshire at 214 N. Main Street, Concord, New Hampshire 03301.

10. Defendant Roger Epperson, individually and doing business as Roger Epperson Authentication, Ltd. and Signed Sealed Delivered, (collectively "Epperson") is a resident of the State of Texas and does business throughout the United States, including the State of California, through his various business entities and on behalf of PSA/DNA and JSA. Epperson may be served with process at his address at 11011 Tulip Garden Court, Houston, Texas 77065, or any other place that he may be found.

11. Defendant Steve Cyrkin, individually and doing business as live.autographmagazine.com (collectively "Cyrkin") is a resident of the State of California and does business throughout the United States through his website live.autographmagazine.com. Cyrkin may be served with process at his address at

3650 Aspen Village Way, Apt E., Santa Ana, California 92704, or any other place that he may be found.

12. Defendant Momentica, LLC, a California Limited Liability Company ("Momentica"), is the registered domain owner of autographmagazine.com, the domain in which Cyrkin uses to do business. Momentica may be served with process by serving its registered agent in California, Steven L. Cyrkin, at its registered address in California at 3650 Aspen Village Way, Apt. E, Santa Ana, California 92704.

13. Whenever in the Complaint reference is made to "Defendants, and each of them" such allegations shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.

14. Plaintiffs are informed and believe, and based thereon allege, that at all times mentioned herein, each of the Defendants were the agent, servant, employee, co-venturer, and co-conspirator of each of the remaining Defendants, and was at all times herein mentioned, acting with the course, scope, purpose, consent, knowledge, ratification, and authorization for such agency, employment, joint venture and conspiracy.

## IV. FACTUAL ALLEGATIONS

### A. The Autograph Memorabilia Industry

15. The autographed entertainment memorabilia industry (the "industry") is a two billion dollar industry that consists of the buying and selling of autographed items (collectively "items") signed by various entertainment, sports, and political celebrities (collectively the "celebrities"). Unlike other industries, the entertainment memorabilia industry is unique in that it consists entirely of rare, hard to find items that cannot be mass produced. There is no substitute for authentic memorabilia. Dealers within the industry are limited to a select few individuals and companies with personal access to celebrities and thousands, if not hundreds of thousands, of dollars to spend.

16. The industry is comprised of dealers, auction houses, third-party authenticators, and end consumers. To sustain the market, dealers, auction houses, and consumers depend on third-party authenticators, of which two dominate the market, those being Defendants' PSA/DNA and JSA, to ensure authenticity of the items sold. Authenticated items can sell for up to a thousand times more than the same non-authenticated item.

17. Within this highly concentrated market are a select few individuals that multiple companies, including auctioneers, dealers, and authenticators, share amongst themselves to control the industry to the detriment of those that are not in this "inner circle." It is through this Cartel of companies and their agreement with each other that the major, self-interested, third-party authenticators can drive out the competition from the market and ensure their preferred auction houses and dealers thrive.

18. The Defendants make up this inner-circle and have engaged jointly in a campaign to remove dealers from the market and maintain anticompetitive barriers to enter the market. Defendants are using their conjoined market power through the authentication process to stifle legitimate competition in the industry by agreeing to ***not authenticate items*** based on the individual competitor, like Mueller, that offer the items for sale. The Cartel don't decide authenticity on the merits – they find lack of authenticity just to shut down competition. Further, Defendants attempt to foreclose competition by disparaging items sold by dealers, including Mueller, as "forgeries" in public forums. Cartel members label their competitors purveyors of forgeries, based on the items the Cartel declare as inauthentic.

19. At the heart of the industry are the items that people collect. These items are physical objects that are actually signed by historical or contemporary celebrities. For historical items, dealers and collectors will purchase these items from numerous sources, including directly from the estates or families of deceased celebrities, other dealers and collectors, or from auctions. Authentic historical items cannot be reproduced. They are limited in existence and increase in value with rarity. For

contemporary items, dealers have only a few avenues by which to obtain autographed items: They pay celebrities large sums for private signings, they buy existing collections at retail rates, they may have anecdotal contact with celebrities and an opportunity for a signature, or attend in-person events where collectors/dealers actually witness the celebrity signing the item. Obtaining contemporary items can cost thousands of dollars if done by personal contract and requires valuable inside connections to celebrity agents.

20. Dealers, including Plaintiff, sell their items mostly online and occasionally at memorabilia shows. Most, if not all, transactions take place online in an auction format. Dealers utilize third-party auctions to cosign items for sale, largely through eBay. RR Auctions sell exclusively online along with a catalog of items for sale.

21. When dealers acquire items for resale, Dealers must issue their own certificates of authenticity ("COA") certifying that the item is authentic. In addition to COAs, Dealers will also provide a money-back guarantee to the authenticity of the items they sold, making it against their economic interest to sell forged items. Dealers are able to issue their COAs and guarantee the authenticity of their items based on their own personal knowledge of the history of the item, including personally witnessing the item actually being signed by the celebrity, or by using their own authentication processes to ensure the authenticity of the item. For over one hundred years, Dealers would sell their items without any third-party authentication. Today, technological advances make it easy to forge COAs making the use of a third-party authenticators indispensable to the industry.

22. The value of an item is based in its authenticity. Items that are branded inauthentic are basically worthless. Therefore, to ensure the value of their items that they are purchasing, consumers rely on third-party authentication services to verify the authenticity of an item. Two firms dominate the third-party authentication market: Defendants PSA/DNA and JSA. Both verify hundreds of thousands of

signatures each year. PSA/DNA and JSA are two of only three approve third-party authenticators for use with eBay, the largest consignment auction online. Dealers and collectors that purchase items will use PSA/DNA and JSA for opinions regarding the authenticity of an item, and if PSA/DNA or JSA find that an item is not authentic, then the dealer or collector will go back to the source where he purchased the item and demand a refund.

23. When items are sold using an auction house on consignment, each auction house typically has an acquisitions person or a consignment director who examines items presented by dealers and collectors to be placed on consignment and put on sale via an auction. The auction house will either judge the authenticity of the item through an in-house authenticator, or it will utilize a contracted authenticator. Once it passes authentication and its value is proved, the consigned item is then placed in the auction house's catalogue. The catalogue describes the item and states who has authenticated the item. Auction houses partner with a third-party authenticator or promote that it uses a third-party authenticator to bolster its credibility under the illusion of objectivity and neutrality.

24. Within this market, PSA/DNA, JSA, R&R, Epperson, and Cyrkin have joined together in a conspiracy, through their intertwined relationships, to drive out their competition, such as Mueller, to the detriment of competition in the market and to Mueller's harm.

**B. The Relevant Market**

25. The relevant "product" market impacted by Defendants' antitrust violations are the nationwide markets for authentic autographed sports and entertainment memorabilia.

26. Because the industry is so specialized and items cannot be mass produced, there is no separate or different source for autographed memorabilia items available to the end consumer.

27. The relevant "geographic" market for determining Plaintiff's antitrust

claims is the United States.

**C. The Cartel**

28. PSA/DNA, JSA, R&R, Epperson, and Cyrkin have conspired together in a network of influence, to discourage their competition through using the power of PSA/DNA and JSA's market influences over the public perception of the authentication of items that are sold in the market. A review of the major actors shared among these select organizations demonstrates the Cartel that the Defendants have created in the autograph memorabilia marketplace.

29. PSA/DNA claims to be the "largest and most trusted third-party grading and authentication company in the world." About PSA CollectibleFacts [sic], available at http://www.psacollectiblefacts.com/about (last visited September 23, 2015). PSA/DNA process over 100,000 items each month. *Id.*

30. JSA claims to be the premier autograph authenticator in the world, assessing thousands of autographs daily. Autograph Authentication Services, available at http://www.spenceloa.com/AboutJSA (Last visited September 23, 2015).

31. PSA/DNA and JSA together account for more than 80% of the third-party authentication services in the relevant industry.

32. Although PSA/DNA and JSA appear to be competitors, most of PSA/DNA and JSA's authenticators perform as authenticators for each company, meaning the same authenticators are acting on behalf of both PSA/DNA and JSA. In addition, some authenticators that are working for PSA/DNA and JSA are also authenticating through their own services, such as Epperson and John Reznikoff, or providing authentication services for auction houses, such as R&R, who stand to profit by ensuring that PSA/DNA or JSA, and their authenticators, are closely aligned to pass their items as authentic. Furthermore, most authenticators that PSA/DNA, JSA, and R&R use are also dealers themselves, who stand to make a profit from ensuring their items pass PSA/DNA, JSA, or R&R authentication through working both sides of the deal – dealing in autographs and authenticating those autographs

through PSA/DNA, JSA, and R&R to ensure their value and ultimate sale. A review of each defendant and their advertised experts shows how deep these relationships run to ensure that this cartel can control the market.

***1. The Cartel Shares the Same Authentication Staff***

33. At all times relevant herein, PSA/DNA employed Roger Epperson, James Spence, Bob Eaton, John Reznikoff, Steve Zarelli, James Camner, Rich Consola, and Wade Hampton as authenticators for its services.

34. JSA employs most of the same experts as well, including Roger Epperson, James Spence, Bob Eaton, John Reznikoff, Steve Zarelli, Wade Hampton, and JD Bardwell.

35. Most of these authenticators do not just work for PSA/DNA and JSA, but also for R&R, which uses Roger Epperson, Bob Eaton, John Reznikoff, Steve Zarelli, James Camner, and Rich Consola to authenticate items submitted for consignment.

36. James Spence began JSA after leaving PSA/DNA. He is the current owner/operator of JSA and also deals in autographed memorabilia. During his time at PSA/DNA and now at JSA, James Spence has consistently dealt in autographed memorabilia through his entity out of Pennsylvania, James Spence III Vintage Autographs, LLC.

37. Bob Eaton is the owner and founder of R&R. Through R&R, Bob Eaton sells thousands of autographed memorabilia through consignments and profits through those sales. He is also a listed expert for PSA/DNA and JSA, and routinely ensures that items being sold on R&R pass PSA/DNA or JSA authentication so that he can profit from such sales.

38. John Reznikoff is the owner of University Archives, dealing in autographed and signed memorabilia from political figures. Through University Archives, Reznikoff sells signed memorabilia as well as his authentication services. In addition, he is a listed authenticator for PSA/DNA, JSA, and R&R. Some of the items that Reznikoff sells through University Auctions actually carry letters of

authenticity from JSA and PSA/DNA. John Reznikoff once asked Plaintiffs to fulfill a trading card company's 1,000 piece order of signed index cards. Plaintiffs were to supply the signed index cards for John Reznikoff to, in turn, supply to the trading card company. After Plaintiffs fulfilled the order, John Reznikoff instructed Plaintiffs to send the items to JSA for authentication, but to be sure to use John Reznikoff's name and return address to insure the signatures passed authentication. By doing so, John Reznikoff admitted that JSA authenticated items based on the source.

39. Steve Zarelli is the owner of Zarelli Space Authentication, LLC, providing authentication services for PSA/DNA, JSA, and R&R. Included in his services, Zarelli also actively promotes R&R by advertising the auction house as the premier auction for space services, which such auctions carry Zarelli's certifications of authenticity.

40. James Camner is the owner of La Scala Autographs, dealing in opera, music, and theatrical autographs. Through his website and on eBay, Camner sells hundreds of autographed memorabilia. In addition to his sales, he actively authenticates for PSA/DNA and R&R.

41. Roger Epperson is a third-party autograph authenticator and autograph dealer. Epperson offers his authentication services through his business known as Roger Epperson Authentication, Ltd., and deals in autographs through his business known as Signed Sealed Delivered. Epperson also currently provides authentication services for R&R, and during the relevant times as provided herein provided authentication services for PSA/DNA and JSA.[1] As late as 2014, PSA/DNA advertised Epperson as part of their "Dream Team" and was "PSA/DNA's Music Man."[2] In addition, Epperson himself advertises that he is "the full time music

[1] http://www.spenceloa.com/OurExperts
[2] http://web.archive.org/web/20140810095137; http://www.psacard.com/Articles/ArticleView/4616/buildingadreamteam

authenticator for JSA since November 2006 – Present."[3]

42. Furthermore, Epperson and Cyrkin are close allies on Cyrkin's website he runs through Momentica, known as Autograph Magazine Live, where Cyrkin fully endorses Epperson and Epperson fully endorses Cyrkin publicly. They both shame other dealers right out of business. Furthermore, Cyrkin and Epperson actively ran advertisements for Epperson's businesses on the website to promote his businesses over other dealers.

43. Steve Cyrkin is an autograph collector, dealer, and authenticator. Cyrkin is also one of the founding owners of Collectors Universe (the parent company of PSA/DNA); in fact, Cyrkin at one time owned 1,000,000 share of Collectors Universe, Inc. stock and may still own stock. Cyrkin owns the website named Autograph Magazine Live through his entity, Momentica, and uses this website to host blogs, sell merchandise and advertising regarding autographed memorabilia, and comment about the market, including using the website as his public platform to promote certain dealers and authenticators in the market and totally destroy others.

44. Cyrkin and Epperson actively use the website to defame, denigrate and label other dealers and authenticators as purveyors of forgeries in hopes of driving business to either Epperson, to PSA/DNA, or to any of their own friends in the industry, including R&R and JSA.

***2. The Cartel Also Shares Information***

45. In addition to sharing the same experts, these seeming "competitors" in the autograph memorabilia market are not competitors in any sense of the word. Through their shared staff and relationships, the cartel routinely shares information with each other regarding the autographed memorabilia market. In furtherance of their agreement, this information is then used to determine which dealers in the market get their items authenticated.

///

[3] http://autographalerttruth.com/credentials.html.

46. As an example, Cyrkin routinely includes Epperson, John Reznikoff, Bobby Livingston (of R&R), and Bob Eaton (of R&R and PSA/DNA) on private emails when discussing other sellers or authenticators and their business, including persons like Mueller and another man, Steve Koschal. Furthermore, through other litigation, Epperson routinely shares information he obtains in discovery with Cyrkin. Cyrkin and Epperson have posted emails shared between them, which emails were turned over during the course of litigation on Cyrkin's blog publicly in an effort to harm Plaintiffs further.

47. R&R and PSA/DNA also collaborate on the authentication of items that R&R sells. In one circumstance, an R&R customer bought over $70,000 of items in an auction that R&R hosted and guaranteed the authentication of the items. The customer submitted the items to PSA/DNA after the auction for authentication without disclosing the fact that the items came from R&R. PSA/DNA failed the authenticity of these items, and upon the customer requesting refunds from R&R, R&R' representative Bobby Livingston immediately engaged PSA/DNA's Joe Orlando and Byron Walters for an explanation.

48. Through various emails, R&R Auctions even requested that PSA/DNA work with R&R to make R&R whole for the PSA/DNA fees that it was going to reimburse the customer. Thus, R&R is ensuring the authentication of its items from PSA/DNA so much that whenever PSA/DNA fails the authentication of an item that R&R sells (without knowing that it came from R&R), R&R demands that PSA/DNA make it whole for the transaction.

***3. The Cartel Uses Their Power to Drive Out Competition***

49. Instead of judging the authenticity of an item based on the signature and the item itself, PSA/DNA, JSA, R&R, Epperson, and Cyrkin are all using their market power they have created from their agreement to employ and utilize this network of authenticators, dealers, and media personalities to come together to ensure that certifications of authenticity are issued only to those dealers that they approve.

Using this power, the Cartel not only force dealers, like Mueller, out of the market, they restrict the number of authentic items within the market raising the prices of the items they sell to the public.

50. Dealers that are out of favor with the Cartel, such as Mueller, cannot authenticate their memorabilia; hence they are forced out of the market entirely. Without dealers in the market who can offer authentic memorabilia, Defendants have foreclosed competition and restricted the number of items on the market available to potential buyers.

51. PSA/DNA, JSA, R&R, Epperson, and Cyrkin, have created a cartel where through their agreement they can control the authentication market to ensure the items sold through R&R or through the authenticator's own dealer-websites are "certified" authentic, and therefore, more valuable. Furthermore, this Cartel exists to drive out any competition from the market by intentionally failing the authenticity of a dealer's items based on the dealer's identity and not on the item itself.

52. The Cartel has impeded competition by cutting off certain markets for its competitors. One prime example is the following: The Cartel, when faced with competition in sales of autographed memorabilia through eBay, sought to prevent vendors, including Mueller, from selling through eBay. The Cartel members comprise 66% of the "approved" authenticators on which eBay relies for authentication services for items sold on eBay.

53. To prevent competition, the approved eBay authenticators and members of the Cartel claimed that their competitors' items were not authentic, when that was not true. As a result, eBay, trusting in its own authenticators, shut down Mueller and other competitors' sales on eBay – eBay was and still is one of the main pipelines for sales of autographed memorabilia in the United States.

54. Significantly, eBay is a platform to engage in competition and a way for a new seller of autographed memorabilia to gain a foothold in the business. For those reasons, the Cartel vigorously and illegally tried to close down new competitors like

Mueller and others.

55. The Cartel has engaged jointly in an extensive campaign of deceit and manipulation to falsify and rig the authentication process. The nature of their actions and disparaging statements concerning competitors, including Mueller, are relied upon by consumers. Defendants' actions in conjunction with its influence over the authentication services has made it difficult and costly, if not impossible, for competitors such the Plaintiff to remain in the market.

**D. The Cartel Colludes to Automatically Fail Mueller's Memorabilia**

56. Throughout the years, PSA/DNA, JSA, R&R, Epperson, and Cyrkin have come together and agreed to reject the authenticity of the memorabilia that dealers, such as Mueller, sell, not based on the actual authenticity of the various items, but based on who the dealer is – if the dealer is in the Cartel, the items are authentic. If the dealer is outside the Cartel, the items are inauthentic. It's as simple as that. The individual Defendants' actions show that they are in agreement with one another, as they share the same experts who publicly malign Mueller as well as fail his items as non-authentic.

57. Sometime in the late part of the 2000s, PSA/DNA wanted Mueller to be one of their experts to promote PSA/DNA. Mueller disagreed on the basis of how PSA/DNA did business in authenticating and refused to join PSA/DNA as an expert authenticator. Joe Orlando, president of PSA/DNA, told Mueller at that time that Mueller could either be "with them, or against them", referring to PSA/DNA's complex network of relationships with James Spence of JSA, Roger Epperson, Bob Eaton of RR Auction, John Reznikoff, and Steve Cyrkin.

***1. PSA/DNA's Actions***

58. Since around 2010 or 2011, PSA/DNA has begun to fail all of Mueller's items, not based on the authenticity of the items themselves, but on the fact that Mueller sells the items.

59. One of the most glaring examples of this is PSA/DNA's "Quick Click

Opinion". Through this option, consumers can received PSA/DNA's "quick opinion" regarding the authenticity of an item that is being sold in an online auction. To receive an opinion of whether the items is "likely genuine" or "not likely genuine", a consumer must fill out a "submission form" on PSA/DNA's website for $15 per item review, or $7.49 for an item sold on in an eBay auction. According to the submission form, a consumer *must* supply a website link to the auction house when requesting a quick opinion. The link shows exactly *who* is selling the item through the auction or what auction house is selling the item. PSA/DNA then has the ability to control the opinion not based on the authenticity of the item itself, as would be available if a consumer was able to just upload an image, but based on who is selling the item, which is exactly what PSA/DNA is doing to harm Mueller.

60. Starting sometime in 2010 or 2011 and continuing to this date, Mueller has received numerous complaints from his now former customers that PSA/DNA's quick click opinion almost always indicated that items with his COA were "likely not authentic" whether the item was sold on Mueller's own website or consigned on a different auction website with Mueller's COA, as follows:

a. David Wright of New Zealand indicated that he submitted 16 different items that Mueller was selling on his website to PSA/DNA's quick click opinion service. All of the items came back with the "likely not authentic designation."

b. David Wright of New Zealand also indicated that he submitted 13 different items to PSA/DNA's quick click opinion service. All of the items were consigned on RR Auction's website. All 13 of the 13 items came back with the "likely authentic designation."

c. EBay user "Kambowl" purchased an autographed photo from Mueller with Mueller's COA through eBay and utilized PSA/DNA's quick click opinion service on the item he had purchased. The item came back with the "likely not authentic designation" and Mueller had to refund the

user's money.

d. EBay user "Win Pherson" purchased six items from Mueller and utilized PSA/DNA's quick click opinion service on the items he had purchased. All of the items came back with a "likely not authentic designation" and Mueller had to refund the user's money.

e. Ralph Norman indicated that he submitted 2 different autographed photographs that Mueller was selling on his website, one of Adolf Hitler and one of Neil Armstrong to PSA/DNA's quick click opinion service. Both of the items came back with the "likely not authentic designation." Mr. Norman failed to purchase the items because of this response.

f. Jim Dennison purchased an autographed album cover from Mueller with Mueller's COA through eBay and utilized PSA/DNA's quick click opinion service on the item he had purchased. The item came back with the "likely not authentic designation" and Mueller had to refund the user's money. Jim Dennison had purchased multiple items from Mueller for a number of years but discontinued his business because PSA/DNA continue to fail all the items that he purchased from Mueller.

61. In addition to PSA/DNA failing Mueller's items based on PSA/DNA's erroneous quick click opinions, PSA/DNA also fails Mueller's items when they are sent directly to PSA/DNA for authentication. PSA/DNA fails these items based on the fact that Mueller sells the item, and not on the authenticity of the items themselves. Below are examples, among many more, of PSA/DNA's failing of Mueller's items.

a. Jarod Thatcher indicated that he submitted a Bobby Fisher signed Iceland Currency that Mueller sold with Mueller COA to PSA/DNA. PSA/DNA returned the item stating that is was "questionable authentication." Mueller had to give a refund for the item.

b. J. Hart purchased a Bill Watterson autographed photograph from Mueller

with Mueller's COA and submitted the item to PSA/DNA for authentication. PSA/DNA returned the item as failing authentication and Mueller had to refund the user's money.

c. Eric Spinner purchased five different autographed photos signed by Shailene Woodley, Jennifer Lopez, Bernadette Peters, Debbie Reynolds, and Lindsay Lohan from Mueller with Mueller's COA and submitted the items to PSA/DNA for authentication. PSA/DNA returned all five items as failing authentication and Mueller has refund Spinner's money. Spinner has never done business with Mueller since.

d. Junior Salim had purchased multiple items from a third-party all with Mueller's COA. Salim submitted some of the items to PSA/DNA for authentication and PSA/DNA failed every item as "non-authentic/questionable authentication."

e. Prestige Auctions refused to sell five different autographed items from Mueller with Mueller's COA, including photos signed by Tom Hanks, Dennis Quaid and Cher, Doris Day, Joe Frazier, and Uma Thurman. Prestige Auctions submitted all of the items to PSA/DNA for authentication and PSA/DNA failed every item as "Not Authentic."

f. Ilene Davis sent multiple items that her late husband had purchased to various auction houses to sell, including RR Auctions and Pristine Auctions, all with Mueller's COA. Pristine sent the items to JSA, and RR Auctions sent the items to PSA/DNA. Both JSA and PSA/DNA failed the authentication of each and every item. Ilene Davis even exclaimed to Mueller that it was her belief that PSA/DNA and JSA failed the items based on the fact that Mueller's COA was with the items.

g. Robert Snyder, a long-time customer of Mueller's, submitted 10 different items to Pristine Auctions for consignment with Mueller's COA. PSA/DNA failed all 10 of these items, including signed photos of David

Lee Roth, Eddie Van Halen, David Bowie, John Glenn, Christopher Lee, Charles Branson, and Sylvester Stallone. Mueller issued refunds to Snyder for all of the items. The letters that PSA/DNA issued showing that the items were not authentic were form letters all indicated the same exact "several factors" that made the items non-authentic, including factor No. 10, which was "Other: _______________". In addition, every letter was signed and endorsed by John Reznikoff (who owns his own dealer website and also works for JSA and RR Auctions), Bob Eaton (who owns RR Auctions), and James Camner (who owns his own dealer website and who works for RR Auctions).

h. Many of Mueller's customers have told Mueller that when they submit his items to PSA without his COA, the items are considered authentic. However these same customers say when they include Mueller's COA when submitting the items to PSA they come back as "likely not authentic" or are "failed" completely.

***2. JSA's Actions***

62. Since in 2010 and 2011, JSA, in line with PSA/DNA, has failed all of Mueller's items, not based on the authenticity of the items themselves, but on the fact that Mueller sells the items.

a. Sometime in 2010, Mueller purchased a host of items from the Estate of Ernie Davis for a total of $73,000. Reggie McLee, Ernie Davis's nephew, personally sold the items to Mueller. Mueller began to resell the items, including Ernie Davis's handwritten and signed homework from when he was at Syracuse University. JSA, PSA/DNA and RR started to approve of the authenticity of the items that came from the Estate until they found out that Mueller was selling the items. Upon finding out this information, JSA and PSA/DNA then began to fail the authenticity of each item, including the homework from Syracuse.

b. This pattern continued, just like PSA/DNA. Tim Neuhaus purchased five items from Mueller that contained Mueller COA. Tim then sent the items to Pristine Auctions for consignment, who then sent them to JSA for authentication. JSA failed all five items and Mueller refunded all of Neuhaus's money.

c. Mueller held a private signing with Farrah Fawcett and obtained multiple signed photos from Ms. Fawcett and sold them with the Mueller COA. EBay user "duesenbergken" purchased one of the photos and submitted it to JSA for authentication. JSA failed the photo as non-authentic and Mueller had to honor his refund guarantee despite the fact Mueller was the only person ever to represent Farrah Fawcett and her autograph in a private signing.

d. Gary Seitz purchased four different autographed items from Mueller with Mueller's COA, including photos signed by Paul McCartney, Jimmy Buffet, Prince, and Barbara Steisand. Mr. Seitz submitted all of the items to JSA for authentication and JSA failed every item as not authentic.

e. William Garbarini purchased multiple items from Mueller and submitted them to JSA before trying to resell them, including a signed baseball, and two items signed by George and Barbara Bush and Dwight Eisenhower. JSA failed each item as non-authentic.

f. In addition, Carlos Cruz purchased multiple items in late 2014 and early 2015 from Mueller with Mueller's COA, including items signed by James Gandolfini, Justin Bieber, Tupac Shakur, Arnold Schwarzenegger, Elizabeth Taylor, Whitney Houston, Rihanna, Stevie Nicks, Eva Mendes, Hugh Hefner, Jack Nicholson, and Iggy Azalea. Cruz submitted each of these items to JSA for authentication, and JSA failed each item as not authentic using the same type of form letter that PSA/DNA uses, including up to thirteen different reasons the items were not authentic.

Similar to PSA/DNA, the reasoning indicated on these letters contradict each other, stating that the signature was "drawn slowly" (reasoning no. 3), that there was "excessive pen pressure and/or improper shading" (reasoning no. 4), and that the "autograph is rubber/steel stamp or printed facsimile reproduction" (reasoning no. 13). This shows that these items were not failed because of an analysis of the actual item, but solely on the fact that the item came from Mueller. Carlos Cruz no longer purchases from Mueller after spending as much as $2,000 per week previously.

g. JSA used this same form letter, with the same exact thirteen reasons, from 2011 to 2014 to fail items that Mueller sold with Mueller's COA, including a photo signed by Julie Andrews' that Mueller sold in 2011 and as well as a photo signed by Rafael Nadal that Mueller sold in 2014.

***3. PSA/DNA and JSA Use Essentially the Same Form Rejection Letter***

63. PSA/DNA and JSA's letters rejecting the authenticity are basically the same type of form letter. PSA/DNA includes ten (10) reasons that an item is not authentic, with no specificity as to exactly why an item failed authentication. One of the reasons (No. 10) is actually "Other: _____________", with no information filled in. JSA issues a similar form letter including thirteen (13) reasons that any item is not authentic. Other than a few additional reasons, one omission, eight of JSA's reasons are the exactly identical to eight of PSA/DNA's reasons, including the same exact wording, capitalization, and punctuation.

***4. R&R' Actions***

64. Before 2011, Mueller and Bob Eaton with RR Auctions had a good relationship. However, because Mueller declined to act as PSA/DNA's expert, and as Joe Orlando told Mueller that if Mueller was not with them, then he was against them, RR Auctions began failing items that Mueller personally attempted to consign through RR Auctions' auctions as well as items that other persons were attempting to consign with RR Auctions. The degradation of the relationship between Mueller and

RR Auctions also had to do with Epperson's disdain for Mueller, as Epperson acts as RR Auctions' expert authenticator for music memorabilia. Just like PSA/DNA and JSA, RR Auctions began failing items with Mueller's COA because they came from Mueller.

a. Ron Tisch spent more than $14,000 with Todd Mueller on autographed memorabilia that he was consigning to RR Auctions with Mueller's COA over a period of seven years. Beginning in 2011, RR Auctions began returning the items to Tisch that came from Mueller stating that the items were not authentic and therefore they would not sell them. Tisch has since stopped doing business with Mueller after Mueller refunded thousands of dollars.

b. Charles Van Dyke also consigned two items he purchased from Mueller to RR Auctions, including a photographs signed by Spencer Tracy and Audrey Hepburn, respectively. RR Auctions failed the authenticity of the items that Mr. Van Dyke submitted for consignment and Mueller had to refund Mr. Van Dyke's money.

c. Ralph Norman, the same person that would not continue to purchase items from Mueller because of PSA/DNA's quick click opinion, also tried to consign items that he had previously purchased from Mueller to RR Auctions on two specific occasions that valued over $10,000. First, in April 2014, Mr. Norman submitted 29 items that had Mueller's COA to RR Auction for consignment. RR Auction returned each and every item to Mr. Norman, citing that most of the items were not authentic and the remainder did not carry enough value to sell. Again, in May 2014, Mr. Norman tried to submit an item with Mueller's COA to RR Auction for consignment, and again, the item was returned as not authentic. For each item returned, RR Auction sent the same exact letter, signed by Bill White with PSA/DNA's logo under his signature, stating that Bill White

found "the signature to be in the hand of someone other than" the person that signed the item. Mueller refunded most of Mr. Norman's money and now Mr. Norman has ceased purchasing from Mueller. RR Auction also told Ralph Norman that an autographed Raquel Welch he purchased from Plaintiffs was signed by her secretary. In fact, Plaintiffs paid Raquel Welch $38,000 for two signings and this item came from Plaintiffs' private signing with Ms. Welch. This either proves RR Auction is incompetent in authenticating her signature or RR Auction intentionally harmed Plaintiffs reputation.

***5. Epperson's & Cyrkin's Round Out the Cartel With Publicity***

65. Similar to Mueller's relationships with RR Auction, Epperson and Mueller had good relationship up to and until 2009-2010. Around the same time that Joe Orlando of PSA/DNA told Mueller that if Mueller was not with "them" then he was against "them," Epperson and Mueller's relationship also began to turn south. As a result, in line with PSA/DNA, JSA, and RR Auction, Epperson began to call every item Mueller would sell that people asked about on websites such as live.autographmagazine.com, which Cyrkin runs. Multiple posts show that Epperson has only an interest attacking all of Mueller's items as forgeries.

66. Epperson is not operating in a vacuum by making these statements, but openly and publicly. From 2010 until now, Epperson publicly suggests all of Mueller's items are forgeries while at the same time providing authenticating services for PSA/DNA, JSA, and RR Auctions. Instead of focusing on each individual item, Epperson, accuses competitors, such as Mueller, of selling forged items in public, and fails to authenticate the competitor's items through his authentication services at PSA/DNA, JSA, and RR Auctions.

67. In essence, Epperson is using his platform through live.autographmagazine.com (Cyrkin's website through Momentica), his agreement with PSA/DNA, and his current authentication positions with RR Auctions and JSA

to ensure that competitors, such as Mueller, cannot sell items as authentic so that Epperson can sell more of his items.

68. Cyrkin, similar to Epperson, has also openly and publicly denounced items sold by the Cartel's competition as forgeries. Cyrkin, like Epperson, does not do this in a vacuum either, but as a co-founder and one-time large stock holder of PSA/DNA's parent company Collectors Universe and Epperson's closest ally in the industry. In fact, Epperson at one time paid Cyrkin or Momentica over $6,000 per year in advertising monies to advertise on live.autographmagazine.com. Although Cyrkin has publicly stated that he isn't an expert – that doesn't stop him from making malicious attacks concerning autographs that are offered by competitors, such as Mueller. Cyrkin and Epperson work closely to promote the cartel. In one instance after Cyrkin denounced an autograph that Iconographs was selling as an "obvious forgery," Epperson followed up announcing that he had the same autograph for sale.

69. Through his agreement with the Cartel, Cyrkin labels items sold by competitors as forgeries in exchange for Cyrkin's ability to pick and choose which autograph dealers he likes or dislikes, such as Mueller, and then call out all of their items as forgeries helps him attract advertising revenues from other, friendly dealers and auctions houses, such as Epperson, as well as helps PSA/DNA earn more money by encouraging consumers to use PSA/DNA's services to further validate what Cyrkin and Epperson have already said.

70. In an industry where value is determined by authenticity, Crykin's false accusations are more than just rhetoric. Cyrkin is the voice of the machine that determines which dealers are allowed to participate in the market. Cyrkin eliminates competition by branding dealers, such as Mueller, as forgers in public forums driving consumers to other members within the Cartel. This cycle of interwoven relationships and suggestions based on Cyrkin's statements that Mueller's items are all inauthentic to provide Cyrkin, Epperson, PSA/DNA, JSA, and RR Auctions to all profit from ensuring that Mueller is forced out of the legitimate competition of selling

authentic autographed memorabilia.

71. The Cartel's actions have grievously injured competition in this market. Example: Assume that only six black top hats exist which are signed by Abraham Lincoln. Mueller has two of them. Defendants have the other four. The defendants proclaim in the online discussion forums and elsewhere that Mueller's top hats are forgeries. One of the Cartel members deem Mueller's top hats inauthentic. The educated consumers of autographed memorabilia will not purchase from Mueller. The two top hats held by Mueller are tainted and valueless. The remaining top hats immediately become more rare and more expensive for the consumer. Abraham Lincoln can sign no more top hats so there is no alternative source for these items.

72. As a result of all of this anti-competitive behavior, Mueller's sales have dwindled. Other would-be competitors have been completely shut down or their sales have been severely curtailed as a result of the anti-competitive behavior alleged above. The public has been harmed.

73. Mueller now brings the following causes of action to hold this cartel of PSA/DNA, JSA, R&R, Epperson, and Cyrkin responsible for the damage they have caused to the autograph memorabilia industry as well as his own business.

## First Cause of Action

## Violation of 15 U.S.C. §1

## (Against All Defendants)

74. Plaintiffs allege and incorporate each and every allegation contained in the preceding paragraphs as though fully incorporated herein and made a part hereof.

75. Section 1 of the Sherman Act provides that "[e]very ... combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is hereby declared to be illegal." 15 U.S.C. § 1.

76. As detailed herein, PSA/DNA, JSA, R&R, Epperson, Cyrkin, and Momentica have all joined together in a combination or conspiracy to agree to boycott certain autograph memorabilia dealers in the autograph memorabilia market,

such as Mueller, by agreeing not to do business with Mueller or by agreeing to fail the authenticity of all or a substantial percentage of Mueller's items based on the fact they came from Mueller and not on the actual authenticity of the item, all in violation of Section 1 of the Sherman Act, Section 1.

77. As detailed herein, PSA/DNA, JSA, R &R Auctions, Epperson, Cyrkin, and Momentica have all joined together in a combination or conspiracy to restrain trade in the autograph memorabilia market to enhance their own positions in the market as authenticators, dealers, and consignors by illegally driving out legitimate competition, such as Mueller, all in violation of Section 1 of the Sherman Act.

78. Section 4 of the Clayton Act provides that "... any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

79. As a direct and proximate result of the aforesaid combination or conspiracy among PSA/DNA, JSA, R&R, Epperson, Cyrkin, and Momentica, and the actions taken pursuant thereto, Mueller has been injured in his business and property as follows: (a) Plaintiffs have lost clients and been unable to sell its products, and has lost substantial income and profits as a result; (b) Plaintiffs have been precluded from business growth that it otherwise would have achieved; and (c) Plaintiffs have otherwise been injured in its business and property.

80. As a result of these federal antitrust violations, Plaintiffs are entitled to recover its actual damages in an amount far exceeding $4,000,000, subject to proof at trial, multiplied by three, and the cost of suit, including a reasonable attorney fees.

81. In addition, Mueller requests any and all possible exemplary damages as determined by a jury after a trial against Defendants for their egregious and malicious actions against Mueller's business.

///

**Second Cause of Action**

**Intentional Interference with Prospective Economic Advantage**

**(Against All Defendants)**

82. Plaintiffs allege and incorporate each and every allegation contained in the preceding paragraphs as though fully incorporated herein and made a part hereof.

83. Mueller has had numerous established business relationships with consumers in the sale of autographed memorabilia, including hundreds of loyal customers who had purchased approximately over $3,000,000 before the actions which took place as described herein. Because of the nature of his customers, and the past dealings that Mueller had enjoyed with his customers, free from the cartel of PSA/DNA, JSA, R&R, Epperson, Cyrkin, and Momentica's actions, Mueller had a reasonable probability that such customers would continue to do business with him in the future. In others words, such relationships would have led to potentially profitable contracts for sales of autographed memorabilia without the interference of the cartel failing the authentication of Mueller's autographed memorabilia without actually examining the items themselves.

84. As indicated herein, Defendants, and each of them, engaged in wrongful conduct designed to disrupt Plaintiff's business relationships. Those include, defaming Mueller's personal character and his business reputation. Defendants also wrongfully opined to and affirmatively failed the authenticity of Mueller's items, not based on the actual authenticity of the items themselves, but on the fact that Mueller sold the items.

85. Defendants, and each of them, failed the authenticity of Mueller's items on the basis that Mueller sold the items to intentionally and knowingly to deter customers from purchasing items from Mueller and having Mueller to have Mueller issue refunds for the items that were sold, thereby damaging Mueller's ability to freely and legitimately sell authentic items in the marketplace, and in turn they caused the loss of customers and future revenue.

86. As a direct and proximate result Defendants' actions, Mueller has been injured in his business and property as follows: (a) Plaintiffs have lost clients and been unable to sell its products, and has lost substantial income and profits as a result; (b) Plaintiffs have been precluded from business growth that it otherwise would have achieved; and (c) Plaintiffs have been removed as an eBay seller six times and banned from selling products on Amazon as a direct result of Defendants' wrongful conduct.

87. As a result of Defendant's illegal and intentional interference with Mueller's business, Mueller has incurred actual damages in an amount that is ongoing and that has not yet been fully ascertained but which is at least $3,000,000.00 for the loss of sales to his customers and his loss of business that he would have made but for Defendants' actions.

88. In addition, Mueller requests any and all possible exemplary damages as determined by a jury after a trial against Defendants' for Defendants' egregious, intentional and malicious actions against Mueller's business.

89. Furthermore, Mueller requests all costs of court for bringing this claim.

**Third Cause of Action**

**Violation of California Bus. & Prof. Code §17200**

**(Against All Defendants)**

90. Plaintiffs allege and incorporate each and every allegation contained in the preceding paragraphs as though fully incorporated herein and made a part hereof.

91. Business and Professions Code §17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

92. As indicated herein, Defendants, and each of them, wrongfully opined to and affirmatively failed the authenticity of Mueller's items, not based on the actual authenticity of the items themselves, but on the fact that Mueller sold the items.

93. Defendants, and each of them, failed the authenticity of Mueller's items on the basis that Mueller sold the items to intentionally and knowingly to deter

customers from purchasing items from Mueller and having Mueller to have Mueller issue refunds for the items that were sold, thereby damaging Mueller's ability to freely and legitimately sell authentic items in the marketplace.

94. Such actions are unlawful, unfair, and fraudulent business practices.

95. As a direct and proximate result Defendants' actions, Mueller has been injured in his business and property as follows: (a) Plaintiffs have lost clients and been unable to sell its products, and has lost substantial income and profits as a result; (b) Plaintiffs have been precluded from business growth that it otherwise would have achieved; and (c) Plaintiffs have otherwise been injured in its business and property; (d) malicious and intentional anti-competitive statements on the internet have prevented Plaintiffs' growth in the business.

96. As a result of Defendant's unlawful, unfair, and fraudulent business practices with Mueller's business, Mueller has incurred actual damages in an amount that is ongoing and that has not yet been fully ascertained but which is at least $3,000,000.00 for the loss of sales to his customers and his loss of business that he would have made but for Defendants' actions.

97. In addition, Mueller requests any and all possible exemplary damages as determined by a jury after a trial against Defendants' for Defendants' egregious and malicious actions against Mueller's business.

98. Furthermore, Mueller requests all costs of court for bringing this claim.

[prayer for relief is on following page]

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment and relief on the Complaint as follows:

1. All of Plaintiffs' actual and consequential damages, which are believed to exceed $4,000,000;
2. Treble damages in accordance with the Clayton Act;
3. Exemplary damages as allowed by law;
4. For reasonable attorneys' fees on all applicable claims;
5. For costs of suit incurred herein; and
6. For such other and further relief as the Court may deem necessary or appropriate.

DATED: October 2, 2015 CHRISTMAN, KELLEY & CLARKE, PC

By: [signature]
Matthew M. Clarke
Dugan P. Kelley
Matthew N. Mong
Attorneys for Plaintiffs

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS FOR WHICH A JURY TRIAL IS AVAILABLE.**

DATED: October 2, 2015 CHRISTMAN, KELLEY & CLARKE, PC

By: [signature]
Matthew M. Clarke
Dugan P. Kelley
Matthew N. Mong
Attorneys for Plaintiffs